558 S.E.2d 306

Michael D. BURNELL, Charles L. Osborne, Jr., Donald D. Sargent, John H. Quinn and Robert R. Bucklew, Sr., Plaintiffs Below, Appellants,

v.

CITY OF MORGANTOWN, West Virginia, a Municipal Corporation, Defendant Below, Appellee.

No. 28850.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 2001.

Decided Nov. 13, 2001.

J. Michael Benninger, Kelly R. Reed, Wilson, Frame, Benninger & Metheney, Morgantown, West Virginia, John F. Dascoli, The Segal Law Firm, Charleston, West Virginia, for appellants.

Rodney L. Bean, Steptoe & Johnson, Charleston, West Virginia, for appellees.

Dennis R. Vaughan, Jr., James V. Kelsh, Vaughan Law Firm, Charleston, West Virginia, for West Virginia Municipal League, Amicus Curiae.

Mark W. Matkovich, Beckley, West Virginia, for the City of Beckley, Amicus Curiae.

Gregory A. Morgan, Young, Morgan & Cann, Clarksburg, West Virginia, for the City of Clarksburg, Amicus Curiae.

McGRAW, Chief Justice.

Appellants, who are residents and qualified voters of appellee City of Morgantown, West Virginia (the "City") brought a declaratory judgment and mandamus action in the Circuit Court of Monongalia County to compel the City to place a proposed ordinance on the ballot requiring, *inter alia,* that the City engage in collective bargaining with representatives of its uniformed and civilian employees, alleging that the City had failed to discharge its mandatory duty under the voter initiative provisions of the municipal Charter. The circuit court granted judgment on the pleadings in favor of the City, concluding

that the proposed ordinance ran afoul of various provisions of the City's Charter, and we now reverse.

## I.

## BACKGROUND

The facts of this case are not disputed. Article VIII of the Morgantown City Charter provides for, among other means of direct citizen participation in the governance of the municipality, an initiative process whereby qualified voters comprising not less than ten percent of the City's electorate may submit a proposed ordinance to Morgantown's City Council, which, if not acted upon by that body without amendment, must be subjected to a vote by the municipal electorate.[1]

Pursuant to this authority, appellants on October 1, 1999 filed an initiative petition with the city clerk entitled, "City of Morgantown Labor Management Cooperative Ordinance." The proposed ordinance contains a number of substantive provisions bearing upon the collective bargaining rights of City employees. (The full text of the measure is set forth in the Appendix to this opinion.) These provisions include section 5, which gives both uniformed and civilian employees the right to organize and bargain collectively without the threat of reprisal. The measure further requires, in section 6, that the City engage in collective bargaining with representatives of up to three "employee associations," for the purpose of "negotiating legally binding contracts concerning wages, conditions of employment, operations, safety, seniority, assignments, transfers, pensions, fringe benefits, grievances and grievance procedures, and other terms and conditions of employment." Section 6 also sets forth a detailed time frame for the commencement and conduct of such negotiations, and further

provides that in the event the parties are unable to agree on contract terms after sixty days, either party may demand that the disputed matters be subject to binding interest arbitration.[2] Under this provision, municipal employees are strictly prohibited from striking or carrying out work slowdowns, and the City is correspondingly forbidden to engage in employee lockouts. Finally, section 7 of the initiative contains a standard severability clause.

The City Clerk subsequently certified the sufficiency of the initiative petition on November 17, 1999, and the City Council, at its December 7, 1999 regular meeting, voted unanimously in support of a motion "to reject th[e] initiative as it may be contrary to State Law and is contrary to the City charter."

After the City failed to take steps to place the initiative on the ballot, appellants on March 3, 2000 commenced the present action in the Circuit Court of Monongalia County, seeking declaratory judgment and mandamus relief based upon their allegation that the City was required to submit the proposed ordinance to the voters. The City later moved for judgment on the pleadings pursuant to W.Va.R.Civ.P. 12(c), arguing that the proposed ordinance violated various provisions of the City's Charter. The circuit court subsequently entered judgment in favor of the City, ruling that the proposed ordinance conflicted with two provisions of the City Charter. First, the lower court found that the initiated ordinance was precluded by language contained in section 8.01(a) of the Charter, which provides, in relevant part, that voter initiatives "shall not extend to the budget or capital program or any ordinances relating to appropriation of money, levy of taxes *or salaries of City officers or employees.*" (Emphasis added.) The court further determined that the initiative conflicted with

---

1. Such initiative procedure is expressly sanctioned by W.Va.Code § 8–12–4 (1969).

2. The proposed ordinance requires that the arbitrator choose on an issue-by-issue basis between each party's "final last best offer," which is defined as "the final position taken by the employer and . . bargaining representative before reaching an impasse." It has been noted that, generally speaking, "[i]nterest arbitration, unlike grievance arbitration, focuses on what the terms

of a new agreement should be, rather than the meaning of the terms of the old agreement. Thus, the arbitrator is not acting as a judicial officer, construing the terms of an existing agreement and applying them to a particular set of facts. Rather, he is acting as a legislator, fashioning new contractual obligations." *Sheet Metal Workers, Int'l Ass'n, Local Union No. 24 v. Architectural Metal Works, Inc.,* 259 F.3d 418, 429 (6th Cir.2001).

section 4.05 of the Charter, which requires that the City Manager or his designee implement a "sound personnel program for the City," and further mandates that such officer recommend "personnel rules"[3] to a three-person Personnel Board, which in turn is charged with presenting its recommendations to the City Council.[4]

In granting judgment on the pleading to the City, the circuit court summarized its stance by stating in its final order that

the charter is drafted in a manner which does not permit employees of the city or any group of citizens to force the city to recognize employee bargaining groups or to engage in collective bargaining with employees. Of course, council is free to enter into collective bargaining agreements with its employees. Apparently, this particular council chose not to do so. The remedy for the [plaintiffs] would appear to be political, not judicial. It would be an appeal to the current council to adopt collective bargaining, or an appeal to the citizens of the City of Morgantown to elect a council, the majority of which favors entering into collective bargaining agreements with public employees. A more difficult remedy would be to embark on an effort to amend the charter itself to remove the restrictions now contained in Sections 8.01 and 4.05.

It is this May 16, 2000 final order that appellants now challenge.

## II.

## STANDARD OF REVIEW

This Court previously indicated that "[a]ppellate review of a circuit court's order granting a motion for judgment on the pleadings is de novo." Syl. pt. 1, Copley v. Mingo County Bd. of Educ., 195 W.Va. 480, 466 S.E.2d 139 (1995); accord Conrad v. Charles Town Races, Inc., 206 W.Va. 45, 47, 521 S.E.2d 537, 539 (1998). Such plenary review is appropriate because "[a] motion for judgment on the pleadings presents a challenge to the legal effect of given facts rather than on proof of the facts themselves." Syl. pt. 2, in part, Copley. Thus,

[a] circuit court, viewing all the facts in a light most favorable to the nonmoving party, may grant a motion for judgment on the pleadings only if it appears beyond doubt that the nonmoving party can prove no set of facts in support of his or her claim or defense.

Syl. pt. 3, Copley. See also Blake v. Charleston Area Med. Ctr., Inc., 201 W.Va. 469, 474, 498 S.E.2d 41, 46 (1997).

## III.

## DISCUSSION

The parties to this litigation would have the Court undertake straightforward consideration of whether the circuit court was correct in its determination concerning the validity of the proposed ordinance; however, this case requires the Court to more generally delimit the proper scope of pre-election judicial review of initiatives and referendums.

### A. Pre–Election Judicial Review

This Court has consistently sanctioned pre-election adjudication of disputes concerning whether the technical or procedural re

---

**3.** Section 4.05(b) of the Charter provides that such personnel rules shall provide for:
  (1) Plans systems and projects as they relate to employee relations, personnel data systems, personnel records, employee classification, evaluation of performance and in-service training programs;
  (2) The formulation of plans, advice and action to conform to applicable state and federal employment laws;
  (3) The provision of a pay plan and guidelines for appointment, promotion, age of retirement and pension for City employees;
  (4) Policies and procedures regulating reduction in force and removal of employees;
  (5) The hours of work, attendance, regulations and provisions for sick and vacation leave;

  (6) Policies and procedures governing relationships with employee organizations;
  (7) Grievance procedures, including procedures for the hearing of grievances by the Personnel Board, which may render advisory opinions based on its findings to the City Manager with a copy to the employee;
  (8) Provide advice and guidance to all City officials, department heads and supervisors as necessary for the administration of the City personnel system.

**4.** City Council is free, under section 4.05, to enact an ordinance without regard to the Personnel Board's proposals.

quirements for placing a measure on the ballot have been complied with, such as whether there are an inadequate number of qualifying signatures on the voter petition. *See, e.g., Cowan v. County Comm'n of Logan County,* 161 W.Va. 106, 240 S.E.2d 675 (1977) (granting mandamus relief requiring vote on petition seeking incorporation of city, where petition signatures and map found in substantial conformity with statute); *State ex rel. Horne v. Adams,* 154 W.Va. 269, 275, 175 S.E.2d 193, 197 (1970) (refusing to order election on bond ordinance because petition failed to specify amount of proposed bonds as required by statute); *State ex rel. Riffle v. City of Clarksburg,* 152 W.Va. 317, 162 S.E.2d 181 (1968) (refusing to order popular election on issue of fire service fee where petition failed to include requisite number of voter signatures); syl. pt. 3, *State ex rel. Bess v. Black,* 149 W.Va. 124, 139 S.E.2d 166 (1964) ("A writ of mandamus will issue to compel the holding of a local option election pursuant to the provisions of Code, 61–10–28, as amended, where it appears from the record that a sufficient number of signatories to a petition calling for such election remain unchecked and are therefore unchallenged."); *State ex rel. Noyes v. Lane,* 89 W.Va. 744, 110 S.E. 180 (1921) (ordering certification of recall petition after holding that city clerk had erroneously failed to include valid signatures).

The Court's responses to substantive challenges involving the content of voter initiatives and referendums have, however, at least on the surface, lacked such analytical coherence. In one early case, *State ex rel. Wells v. City of Charleston,* 92 W.Va. 61, 114 S.E. 382 (1922), the petitioner sought a writ of mandamus to compel the city to conduct an election on a proposed ordinance governing the granting of permits for private bus lines. In defense of their action in refusing to place the initiative on the ballot, the city argued that the proposed ordinance was in conflict with a general statute governing the same subject matter.[5] In *Wells* we signaled our reluctance to interfere with what was characterized as an inherently legislative process:

> That the legislative power involved here is vested in the mayor and council and citizens of the city of Charleston does not change its character. It is just as free from judicial interference as if it remained in the Legislature. It is still a part of the sovereign power. . . . Under the charter of the city of Charleston, the voting citizens, through the initiative and referendum provision are clothed with legislative power, as well as the council. In their hands it has the same qualities and characteristics as it has in representative bodies. Among these qualities is the right to exercise it, upon compliance with the preliminary requirements necessary to its acquisition. That right in the Legislature is beyond control by any court.

92 W.Va. at 64–5, 114 S.E. at 383–84 (citations omitted). The Court went on to order that the city discharge its ministerial duty under the initiative provisions of the city charter, holding in syllabus point four of *Wells* that it was no defense that the ordinance would be invalid if adopted:

> A city council acting under a charter requiring them to pass an ordinance proposed to them for passage, by petition of a prescribed number of voters of the city, within a specified time, or submit the question of its adoption to the voters, at an election to be called for the purpose, *cannot refuse to call such election and submit such question, if the proposal is properly made, upon the ground that the ordinance, if passed, would be invalid,* and mandamus lies in such case to compel the calling of such election and submission of such question.

(Emphasis added.)

The Court in *Wells* thus enunciated a broad rule prohibiting pre-election adjudication of disputes concerning the substantive validity of proposed direct legislation. In so doing, we rejected the applicability of the longstanding rule that mandamus will not

---

**5.** *See State ex rel. Wells v. City of Charleston,* 92 W.Va. 611, 615, 115 S.E. 576, 578 (1922) (refusing in subsequent proceeding to enforce ordinance proposed by voter initiative, after its adoption by city counsel, on basis that it conflicted with statute).

issue when such relief will prove unavailing, fruitless or nugatory,[6] stating that

[a] legislative act, though void, takes effect, goes into operation, and operates until it is declared void by some court, upon a proper application. This ordinance, if adopted, may operate without objection from any one, even though affected with infirmities of such character as would render it impeachable. Upon constitutional grounds, some statutes are voidable rather than void. Until declared void, they always operate. Hence it is clear that the relators may obtain the operation, as well as the enactment, of the ordinance they propose.

*Wells,* 92 W.Va. at 65–6, 114 S.E. at 384.

*Wells* notwithstanding, the Court in more recent cases has shown no reluctance in determining the validity of direct legislation prior to its submission to the voters. In *State ex rel. Plymale v. City of Huntington,* 147 W.Va. 728, 131 S.E.2d 160 (1963), for example, petitioners sought to force an election on two proposed ordinances brought forth under the voter initiative provisions of the city charter. The proposed ordinances would have had the effect of repealing two ordinances previously adopted by the city council imposing refuse removal and fire service fees. In contrast to the city charter provision, which required only that the initiative petition contain the signatures of ten-percent of the city's electorate, a statute, W.Va.Code § 8–4–20 (1961) (presently codified, as amended, at W.Va.Code § 8–13–13 (1971)), provided for a referendum election only in the event that at least thirty-percent of the municipality's eligible voters signed a protest petition objecting to such fees within 15 days of publication of notice. The Court in *Plymale* refused to order an election on the two proposed ordinances, holding that

there is an obvious inconsistency, if not conflict, between the pertinent charter provision and the general law. It is clearly the weight of authority, and it is expressly provided in our Constitution, that in the event of an inconsistency or conflict between a charter provision and a general law, the latter will prevail.... Therefore, since the general law, Code, 8–4–20 as amended, provides an exclusive remedy to prevent an ordinance from becoming effective, resort to that remedy alone must be had. In other words, the referendum contained in Code, 8–4–20, as amended, provides the only manner in which the action of council can be challenged.

147 W.Va. at 735, 131 S.E.2d at 164 (citations omitted). In reaching this conclusion, the Court distinguished two previous cases, *State ex rel. Schreyer v. City of Wheeling,* 146 W.Va. 467, 120 S.E.2d 389 (1961), and *Bachmann v. Goodwin,* 121 W.Va. 303, 3 S.E.2d 532 (1939), both of which had relied, in part, upon *Wells* as a basis for granting mandamus relief on claims that voter initiatives should be placed on the ballot:

In those cases the ordinances sought to be repealed were adopted by the respective city councils pursuant to the general powers granted by their charters. They were not enacted under the authorization of a general law, as was the situation in this case. In those cases there was no limitation by general law as to the manner in which such ordinances may be repealed. In the instant case a limitation does exist. In Code, 8–4–20, as amended, the manner of challenging these fee ordinances is specifically provided and resort may not be had to a method prescribed by charter of such charter provision is in conflict with or circumscribes that general law.

*Plymale,* 147 W.Va. at 736, 131 S.E.2d at 165.

The Court took a similar approach in *Delardas v. Morgantown Water Comm'n,* 148 W.Va. 776, 137 S.E.2d 426 (1964), where the appellants challenged the circuit court's refusal to grant mandamus relief in their action to compel an election under the same statute at issue in *Plymale,* former W.Va. Code § 8–4–20. In that case the City had refused to conduct the election on the basis that it had already obtained a certificate of

---

**6.** *See, e.g.,* syl. pt. 1, *Hall v. Staunton,* 55 W.Va. 684, 47 S.E. 265 (1904) ("The extraordinary writ of mandamus will never be issued in any case where it is unnecessary, or where, if issued, it would prove unavailing, fruitless, and nugatory. The court will not compel the doing of a vain thing. A mere abstract right, unattended by any substantial benefit to the party asking mandamus, will not be enforced by the writ.").

convenience and necessity from the Public Service Commission, approving and authorizing the sewerage rates and fees contained in a previously adopted ordinance. The Court in *Delardas* affirmed the lower court, holding that the otherwise sanctioned referendum election had to "yield to the paramount power of the State, vested in the public service commission by the applicable statutory provisions ... to establish and promulgate such rates and charges." 148 W.Va. at 786, 137 S.E.2d at 433. In reaching this conclusion, we applied reasoning that is seemingly diametrically opposed to that employed in *Wells*:

> Inasmuch as refusal by the voters of the City of Morgantown to ratify the ordinance at any election that might be held could not in any way affect, nullify or supersede the rates and charges established by the final unreviewed order of the public service commission ..., any election held after the entry of such order would be of no force or effect but would be entirely fruitless and utterly unavailing. For that reason a writ of mandamus to require the City of Morgantown to hold such useless election should not be awarded. It is well settled by many decisions of this Court that a writ of mandamus will not be issued in any case when it is unnecessary or when, if used, it would prove unavailing, fruitless or nugatory....

*Id.* at 787–88, 137 S.E.2d at 434 (citations omitted).

More recently, in *State ex rel. Foster v. City of Morgantown*, 189 W.Va. 433, 432 S.E.2d 195 (1993), the City's voters sought to force a referendum on an amendment to the City's zoning ordinance, relying upon the procedure set forth in the city charter. The Court had previously held in *State ex rel. MacQueen v. City of Dunbar*, 167 W.Va. 91, 278 S.E.2d 636 (1981), that because the statute governing the amendment of existing zoning ordinances, W.Va.Code § 8–24–23 (1969), "do[es] not authorize a referendum on amendments to a zoning ordinance, none is required or permitted." Syllabus, in part, *MacQueen.* Consistent with both *MacQueen* and *Plymale,* the Court in *Foster* refused mandamus relief, holding that the referen-

dum procedure contained in the city charter was, in this specific context, preempted by the provisions of W.Va.Code § 8–24–23. *Foster*, 189 W.Va. at 437, 432 S.E.2d at 199.

It is difficult, though not impossible, to square our past decisions regarding the justiciability of pre-election challenges to voter initiatives and referendums. All of the cases discussed above involved the question of whether the initiated legislation in some way conflicted with superior statutory law. *Wells* is distinguishable, however, in that the inconsistency at issue there did not involve the basic subject matter of the proposed ordinance. The voters in *Wells* were free to propose an ordinance dealing with the matter of bus line permits, limited only by the possibility that such ordinance could later be struck down following enactment if it failed to reflect the minimum requirements of state law. In contrast, the irresolvable conflicts in *Plymale, Delardas* and *Foster* all had the effect of completely prohibiting certain subject matters from consideration by direct legislation.

A number of courts and commentators have drawn an analytical distinction between the issue of whether a proposed measure will, if passed, be substantively invalid because it conflicts with a constitutional, statutory or charter provision, and the more immediate question of whether a measure is a proper subject for direct legislation. *See generally* James D. Gordon III & David B. Magleby, *Pre–Election Judicial Review of Initiatives and Referendums*, 64 Notre Dame L.Rev. 298, 302–3 (1989) (arguing that procedural and subject-matter restrictions should be subject to pre-election judicial scrutiny, while substantive challenges should not).

The Washington Supreme Court, for example, while it adheres to a general policy of "refrain[ing] from inquiring into the validity of a proposed law, including an initiative or referendum, before it has been enacted," nevertheless recognizes an exception in that "courts will take cognizance of certain objections to an initiative measure, and one of these is that the proposed law is beyond the scope of the initiative power." *Seattle Bldg. and Constr. Trades Council v. City of Se-*

*attle,* 94 Wash.2d 740, 745–46, 620 P.2d 82, 86 (1980); *see also Foster v. Clark,* 309 Or. 464, 471, 790 P.2d 1, 5 (1990) (holding that general prohibition on pre-election judicial review of substantive content of initiative and referendum measures does not extend to "qualifying language . . . used in the constitution itself").

Of course, as the cases decided by this Court attest, such differentiation is not always easily accomplished. As one commentary observes:

> Sometimes it is difficult to tell whether a particular restriction is a subject matter limitation or a general substantive prohibition. Subject matter restrictions that appear in the constitutional provision or statutory section that authorizes direct legislation are usually easily identifiable. However, subject matter limitations need not appear in the authorizing section, since that requirement would elevate form over substance. For example, some courts hold that zoning is not a proper subject matter for initiatives because the initiative process does not provide for notice and hearing as required by other constitutional provisions. Also, in some states initiatives may be used to amend but not to revise the state constitution, *i.e.,* they may add a provision to the constitution but not change an existing provision. This is because the state constitution explicitly provides special requirements for revising the constitution, and the initiative process does not satisfy these requirements. Such restrictions are genuine subject matter limitations because they simply exclude initiatives from certain subject matters. On the other hand, general constitutional or statutory restrictions that ban all laws which have a specified effect (such as laws abridging the freedom of speech) are general substantive prohibitions, not subject matter limitations. Challenges based on them should be reviewed only after the election.

Gordon & Magleby, *supra,* at 316–17 (emphasis added) (footnotes omitted).

Although not explicit, our previous cases in this area have adhered to this general distinction, prohibiting pre-election interference with initiative and referendum measures on the alleged basis of substantive defects in the proposed legislation, while at the same time permitting early determination of issues concerning both whether the procedural requirements for placing a measure on the ballot have been satisfied, and whether a measure conforms to applicable subject matter restrictions.

There is logic behind such an approach. As we stressed in *Wells,* initiatives and referendums should be afforded the same dignity and respect as any other legislative process. *Wells,* 92 W.Va. at 64–5, 114 S.E. at 383–84. Indeed, it has been our longstanding practice to refrain from interfering in the enactment of municipal legislation. *See Perdue v. Ferguson,* 177 W.Va. 44, 47, 350 S.E.2d 555, 559 (1986) ("This principle that an injunction does not lie to restrain enactment of an ordinance applies generally even though the proposed ordinance is alleged to be unconstitutional or otherwise invalid.") (citing *City of Charleston v. Littlepage,* 73 W.Va. 156, 160–62, 80 S.E. 131, 133–34 (1913)). By confining pre-election judicial review to instances where voter petitions are either technically defective or otherwise wholly extraneous by embracing a subject matter that is expressly or impliedly precluded, we limit ourselves to adjudicating present and justiciable controversies concerning whether proposed measures are, from a fundamental standpoint, legally authorized. Any other approach would entail the undesirable risk of judicial usurpation of the legislative process:

> There is a natural and intended tension between the judicial and legislative branches of government. Should courts attempt to encroach on the prerogatives of the . . . legislature, members of that institution have not only the resources to resist, but also a self-interested goal of preserving institutional autonomy. Popular legislation, in contrast, is only a process, not an institution. The danger of judicial usurpation of that process is therefore ever present.
>
> Courts must recognize that unless state law provides otherwise, the degree of judicial deference to the popular legislation process should be no less than the degree

of deference accorded the legislature. Though popular democracy is not without faults, states that have adopted it to supplement the powers of the legislative body have recognized it as a legitimate law-enacting process. Its products, whether constitutional amendments or statutes, are of course subject to the same judicial scrutiny as are laws passed by the legislature. Courts that take it upon themselves to restrict the operation of the process before it has run its course only derogate its validity and utility. As a result, popular respect for the judiciary declines and public frustration with government institutions increases.

Michael J. Farrell, Note, *The Judiciary and Popular Democracy: Should Courts Review Ballot Measures Prior to Elections?*, 53 Fordham L.Rev. 919, 935 (1985).

■ We therefore see no need to stray from the time-tested approach reflected by our previous cases. Thus, in line with this authority, we hold that a court may undertake pre-election judicial review of a proposed voter initiative or referendum only to the extent that such direct legislation is alleged to either (1) violate procedural or technical requirements incident to placing the measure on the ballot, or (2) involve a subject matter that is beyond the scope of the initiative or referendum power. The courts of this jurisdiction are otherwise prohibited from undertaking to adjudicate the substantive validity of an initiative or referendum during the pre-election phase of its consideration.

■ In the present case, there is little question that the prohibition contained in section 8.01(a) of the Charter amounts to a subject matter restriction, and was therefore amenable to pre-election judicial review before the circuit court. On the other hand, section 4.05—which provides a procedure whereby the City Manager and Personnel Board are charged with making recommendations to the City Council regarding "personnel rules"—clearly does not amount to a subject matter restriction.

While the scheme laid down in section 4.05 of the Charter is binding upon the City Manager and Personnel Board, it obviously does not provide the exclusive means of promulgating the City's personnel policies. Significantly, the City Council is not bound to follow the recommendations of the Personnel Board. Even counsel for the City, during oral argument, conceded the fact that the Charter does not limit the authority of City Council to sanction a collective bargaining process through an appropriate ordinance.[7] In this case we simply find no impediment to the voters using the initiative power to achieve the same end, so long as City Council is free, in the final instance, to accept or reject the results of such collective bargaining.

Consequently, we find that the lower court erred in this case by undertaking to decide the issue of whether the proposed ordinance was in conflict with section 4.05 of the Charter. Rather, the circuit court should have limited its review to ascertainment of whether the initiative violated the subject matter restriction set forth in section 8.01(a) of the Charter, which prohibits initiatives relating to "the budget or capital program or ... to appropriation of money, levy of taxes or salaries of City officers or employees."

### B. Total Invalidity Requirement

■ Our conclusion that the issue of whether the proposed ordinance runs afoul of section 8.01(a) of the Charter is susceptible to pre-election judicial determination does necessarily lead to full-blown adjudication of the question. Although this Court has never been faced with the issue, most courts follow the rule that before an initiative or referendum may be withheld from the electorate, it must be shown that the measure is facially invalid in its entirety. *See generally* 5 Eugene McQuillin, *The Law of Municipal Corporations* § 16.69, at 361 (3d ed.1996).

The Florida Supreme Court long ago took this approach in *Dade County v. Dade County League of Municipalities*, 104 So.2d 512

---

7. *See* syllabus, *Local 598, Council 58 Am. Fed'n v. City of Huntington*, 173 W.Va. 403, 317 S.E.2d 167 (1984) ("Under its general power, 'to con-tract and be contracted with', W.Va.Code 8–12–1 [1969], a municipality is empowered to enter into a collective bargaining agreement.").

(Fla.1958), stating that when proposed legislation is attacked as invalid,

> the courts will not interfere if upon ultimate approval by the electorate such proposal can have a valid field of operation even though segments of the proposal or its subsequent applicability to particular situations might result in contravening the organic law. In other words, if an examination of the proposed amendment reveals that if adopted it would be legally operative in part, even though it might ultimately become necessary to determine that particular aspects violate the Constitution, then the submission of such a proposal to the electorate for approval or disapproval will not be restrained.

104 So.2d at 515 (citations omitted).

The South Carolina Supreme Court took a similar approach in a case involving the validity of a proposed municipal ordinance that attempted to control the imposition of tolls by state authorities. In affirming the lower court's refusal to order that the initiative be placed on the ballot on the basis that is was facially defective, it was stressed that

> Courts recognizing the propriety of pre-election review will not interfere with the submission of an initiated ordinance to the electorate if the initiated ordinance can be construed to be legally operative in part, even though ultimately a court might need to determine which aspects of the initiated ordinance are invalid.

*Hilton Head Island v. Expressway Opponents,* 307 S.C. 449, 456, 415 S.E.2d 801, 805 (1992) (citing *Dade County,* 104 So.2d at 515); *see also Wyoming Nat'l Abortion Rights League v. Karpan,* 881 P.2d 281, 289 (Wyo.1994) (holding that "an initiative, attacked as facially unconstitutional, must be unconstitutional *in toto* before we could foreclose its inclusion in the ballot for a vote of the people").

■ We likewise see no reason to require that initiative and referendum petitions be drafted with uncompromising perfection, and therefore hold that before a proposed measure may be withheld from the ballot on the basis that it is beyond the scope of the initiative or referendum power, it must be determined that the measure is defective in its entirety such that none of its provisions could, under any circumstances, have operative effect. Thus, in order to uphold the action of the circuit court in refusing to require that the proposed ordinance be submitted to the City's voters, this Court would necessarily have to find that the measure was facially invalid in its entirety based upon the subject matter limitation contained in section 8.01(a) of the Charter. This we are unable to do.

While the proposed ordinance purports to require collective bargaining with respect to, among other matters, wages, and on that account may therefore be said to come within section 8.01(a)'s proscription against ordinances "relating to ... [the] salaries of City officers or employees," [8] wages are but one of the many issues subject to collective bargaining under section 6 of the ordinance. In addition to wages, collective bargaining may also encompass such matters as conditions of employment, operations, safety, seniority, assignments, transfers, and grievances. By no stretch of the imagination could any of these issues be thought to sufficiently affect salaries or the appropriation of money so as to come within the subject-matter prohibitions of section 8.01(a). Nor do the procedural requirements of the proposed ordinance necessarily run afoul of these limitations, so long as they are not used to affect changes in the salaries of City employees. Finally, it is clear that section 5 of the proposed ordinance, which merely provides for the right of City employees to organize without fear of reprisal, in no way conflicts with the prohibition against initiatives bearing upon salaries.

■ Thus, we conclude that the proposed ordinance, if adopted, would not be invalid in its entirety based upon the subject matter restrictions contained in section 8.01(a) of the City Charter. The ordinance, in fact, contains a severability clause that contemplates the possibility that some of its terms may

---

**8.** *Cf. Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39, 48 (1987) (giving similar phrase, "relates to," a "'broad common-sense meaning'") (citation omitted).

eventually prove invalid for one reason or another. Consequently, since consideration of any other alleged infirmity in the proposed ordinance was premature, as discussed above, the circuit court erred in refusing to grant mandamus relief requiring the City to submit the ordinance to the voters for their consideration. *See* syl. pt. 1, *State ex rel. Horne v. Adams.* 154 W.Va. 269, 175 S.E.2d 193 (1970) ("Mandamus is the proper remedy to compel a city council to submit a question to the voters where the law provides for such submission and council refuses to do so."); *see also State ex rel. Elliott v. Adams,* 155 W.Va. 110, 113, 181 S.E.2d 276, 278 (1971) ("when the requisite number of signatures is contained upon a valid [initiative] petition, mandamus will lie to compel the council to submit the question to the voters at an election where the council has refused to adopt such ordinance or submit such question to the voters of the municipality") (citing *State ex rel. Plymale v. Garner,* 147 W.Va. 293, 128 S.E.2d 185 (1962)). Upon remand, the court below is instructed to order that the proposed ordinance be placed on the ballot as otherwise provided by section 8 of the Charter.

## IV.

## CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Monongalia County is reversed and remanded with directions that the lower court issue a writ of mandamus compelling the City of Morgantown to submit the proposed ordinance at issue herein to the City's voters.

Reversed and remanded with directions.

Justice DAVIS, deeming herself disqualified, did not participate in the decision in this case.

Judge TOD KAUFMAN, sitting by temporary assignment.

Justice MAYNARD dissents.

## APPENDIX

### Referendum Petition

To: The Honorable Mayor and Members of the Morgantown City Council

We, the undersigned qualified voters of the City of Morgantown, West Virginia, hereby petition the Morgantown City Council to adopt an ordinance entitled: "City of Morgantown Labor Management Cooperative Ordinance."

SECTION 1. Title

This ordinance shall be known, and cited as the City of Morgantown Labor–Management Cooperative Ordinance.

SECTION 2. Definitions

When used in this ordinance:

(a) "Arbitration" means the procedure by which an impartial third party hold a hearing, takes testimony and renders a decision which is binding upon the parties for the purpose of resolving a dispute between the Employees and the Employer.

(b) "Bargaining Unit" means a group of Employees who have a clear and identifiable community of interest in the terms and conditions of employment. For the purposes of this Ordinance, it is presumed that there will be three (3) bargaining units: The International Association of Firefighters Local 313 who will represent firefighters. Law enforcement personnel will be represented by the Fraternal Order of Police Lodge 87. Civilian City personnel may choose, if they so desire, one association to represent them.

(c) "Collective Bargaining" means the performance of the mutual obligations of the Employer and the Exclusive Representative to meet at reasonable times and places, to confer and negotiate in good faith with the intent of reaching agreement, to enter into Binding Arbitration when differences reach Impasse, and to execute a written agreement with respect to wages, conditions of employment, operations, safety, seniority, assignments, transfers, pensions, fringe benefits, grievances and grievance procedures, and other terms and conditions of employment: provides, that neither party is required to make a concession nor compelled to agree to a proposal put forth by the party absent Binding Arbitration.

(d) "Employee" means any employee of the employer except elected officials, administrative officials, boards and commission members, and chief/department heads.

(e) "Employer" means the City of Morgantown or any person or persons designated by the City of Morgantown.

(f) "Exclusive Representative" means the Labor Organization which has been chosen by the Employees as the representative of the majority of the Employees of a Bargaining Unit.

(g) "Impasse" means the point in the process of negotiations between the Employees and the Employer at which either party determines that no more progress toward resolving differences and/or concluding a Collective Bargaining Agreement can be made.

(h) "Labor Organization" means an organized body of individuals which exists for the primary purpose of dealing with an Employer concerning wages, conditions of employment, operations, safety, seniority, assignments, transfers, pensions, fringe benefits, grievances and grievance procedures, and other terms and conditions of employment.

(I) "Last Best Offer" means the final position taken by the Employer and the Exclusive Bargaining Representative before reaching an Impasse.

SECTION 3. Findings and Declarations

The people of the City of Morgantown hereby find and declare all of the following:

(a) Fire fighting, law enforcement, and emergency medical services are among the most vital services provided to the citizens of this community.

(b) It is critical that fire, law enforcement, emergency medical service, and other vital City services, equipment and personnel respond quickly so that the citizens of Morgantown are protected from the dangers of crime, civil disturbances, fire and other natural and man-made disasters.

(c) In order to maintain the efficiency of the fire, law enforcement, emergency medical service, and other vital City services in Morgantown, it is critical that the City and uniformed and civilian personnel maintain an ongoing dialogue concerning their working conditions, safety, wages, and benefits.

(d) It is important that any disputes involving working conditions, safety, wages, and benefits, be cooperatively and quickly resolved in order to maintain the high level of performance and moral of the uniformed and civilian employees.

(e) The citizens of Morgantown shall have a system of collective bargaining, and binding interest arbitration between the City and it's uniformed and civilian employees.

(f) The City shall be required to enter into collective bargaining negotiations with the duly elected representatives of an employee association representing the majority of all employees as soon as possible after the enactment of this ordinance in order to determine wages, conditions of employment, operations, safety, seniority, assignments, transfers, pensions, fringe benefits, grievances, and grievance procedures for uniformed and civilian employees.

SECTION 4. Purpose and Intent

The citizens of the City of Morgantown hereby declare their purposes and intent in enacting the Ordinance to be as follows:

(a) To maintain the high level of fire fighting, law enforcement, emergency medical service, and other vital services already provided to the City of Morgantown, by the City of Morgantown.

(b) To provide collective bargaining rights, including, contract negotiations and binding interest arbitration, to uniformed and civilian employees below the ranks/positions of Chief/Department Head.

(c) To require the City of Morgantown to begin negotiations with the duly elected representatives of the uniformed and civilian employee association representing the majority interest of all personnel for the purpose of entering into a binding collective bargaining agreement.

(d) To mandate the City of Morgantown to become a party to binding interest arbitration, leading to contracts, which are enforceable in a court of law, with representatives of the uniformed and civilian personnel.

(e) To prohibit any strikes or work slowdowns by uniformed and civilian employees or lockouts by the City of Morgantown.

SECTION 5. Rights of Employees and Employer

(a) City Employees will have, and shall be protected in the exercise of, the right to self-organization, to resolve issues through representatives of their own choosing, and to engage in other concerted activities for the purpose of issue resolution or other mutual aid or protection. No Employee will be discharged against in regard to hire or tenure of employment or any term or condition of employment because of his or her exercise of such rights. No agent of the Employer, person or group of persons, directly or indirectly will interfere with, restrain, or coerce Employees in the exercise of such rights.

(b) Nothing in this Ordinance will prevent an employee from presenting a grievance to the employer and having the grievance heard and settled pursuant to the West Virginia Civil Service Code or any grievance procedure that exists apart from this Ordinance without the intervention of a Labor Organization: provides, that the Exclusive Representative is afforded the opportunity to be present and to present its view on the matter: and provides, that every settlement made will be consistent with the terms of any agreement in effect between the Employer and the Exclusive Representative.

(c) Nothing in this Ordinance is to be construed as giving an Employee a right to strike or to conduct any work stoppage.

SECTION 6.

Section _____ of the City of Morgantown Municipal code is amended to read:

Section _____. The City of Morgantown Labor–Management Cooperative Ordinance.

The City of Morgantown hereby ordains that the Mayor and City Council/City Manager enter into collective bargaining negotiations with the duly elected representatives of the sworn uniform employees, and civilian employees below the rank of Chief or Department Head, for the purpose of negotiation legally binding contracts concerning wages, conditions of employment, operations, safety, seniority, assignments, transfers, pensions, fringe benefits, grievances and griev-

ance procedures, and other terms and conditions of employment. A total of only three-employee associations will be permitted as the exclusive representative of City personnel for the purpose of establishing collective bargaining contracts. The International Association of Fire Fighters Local 313 will represent fire fighters. Law enforcement personnel will be represented by the Fraternal Order of Police Lodge 87. Civilian personnel may choose, if they so desire, on association to represent them.

(I) Collective bargaining negotiations must begin within thirty (3) calendar days after a demand for negotiations by the associations representing the uniformed or civilian personnel or the City of Morgantown. In the case of a successor agreement, negotiations must begin between ninety (90) and one hundred twenty (120) calendar days before the expiration date of the prior agreement.

(ii) The City and the associations representing the uniformed or civilian personnel shall engage in binding interest arbitration for the purpose of resolving any disputes or impasses arising from collective bargaining negotiations. The American Arbitration Association shall be used for the purposes of binding interest arbitration.

(iii) If the parties cannot agree to a contract after sixty (60) calendar days from the start of contract negotiations then either party can demand binding interest arbitration. Each party may present a final issue by issue last best offer no later than midnight of the fifty-ninth (59) day. The arbitrator shall render a decision by selecting on an issue-by-issue basis last best offer based upon evidence presented, one of the following: (a) the employer's final last best offer; (b) the union's final last best offer. The arbitration must be finished, including all hearings, and a decision, within forty five (45) calendar days following the start of the arbitration.

(iv) The arbitrator shall be selected from a list of seven (7) arbitrators provided by the American Arbitration Association. The arbitrator shall be selected by the parties from the list of seven (7) alternatively striking three (3) names beginning with the City. The sole remaining name will be the arbitrator. The cost for the arbitration including the

arbitrators fee, expenses, and any other fees shall be paid for by the party losing on a single issue or majority of issues presented to the arbitrator for decision. Parties ordering transcripts or copies of transcripts shall be responsible for the cost.

(v) All terms and conditions of any pre-existing contract between the City of Morgantown and the employee association shall remain in full force and effect until a new contract has been negotiated and ratified by all parties.

(vi) Nothing contained herein shall permit any public safety uniformed employee or Civilian employee of the City to engage in a strike or work slowdown or the City to lockout public safety uniformed employees, and civilian employees.

SECTION 7.   Severability

If any provision of this ordinance or the application thereof to any person or circumstances is held invalid or unconstitutional under applicable law, such invalidity or unconstitutionality shall not affect other provisions or applications of this initiative which can be given effect without the invalid or unconstitutional provision or application, and to this end provisions of this initiative are severable.